[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 BACKGROUND
The plaintiff's appeal pursuant to § 8-30g of the General Statutes from the denial of their application seeking approval to construct 96 detached single family dwellings ("Newtown Village") of which 24 units (25%) would be dedicated to affordable housing as that term is defined in the statute. The application was presented in two parts. First, the applicant sought an amendment to the Newtown zoning regulations seeking deletion of a single sentence from § 4.22.322[1] in the order to eliminate the requirement that in all affordable housing developments sewage disposal systems "rely solely on the land for hydraulic and renovation capability to treat the discharge from the proposed development". The second of part of the application sought a permit as a special exception pursuant to § 4.22.200 of the regulations.
The property consists of the thirty two acres, more or less, of undeveloped land zoned R-1 which permits detached single family dwellings on one acre lots. In addition, the affordable housing regulations of the town of Newtown (§ 4.22) permit up to six units of affordable housing per acre upon the granting of a special exception pursuant to § 8-04 of the regulations.
The property is bordered on the west by an entrance ramp to Interstate 84, on the northeast by Philo Curtis Road a town highway, on the south by State Route 34 and on the southeast by Bishop Circle. The site is served by public water supply but not by the municipal sewerage system, hence the basis for this appeal. In denying the application the defendant assigned five reasons which can be distilled down into three categories (i) sewage disposal, (ii) a traffic impact, (iii) earth removal. With the parties consent and in the presence of counsel and selected party representatives the court viewed the property. CT Page 3700
 AGGRIEVEMENT
Based on the testimony of John Horton of DH Homes, LLC and John Maddeo of Fairfield 2000 Homes Corporation as well as the documentary evidence introduced at the hearing the court finds the following. DH Homes, LLC is aggrieved by virtue of its status as party to a written agreement with the owner of the property under which it enjoys the right to acquire and develop the property. That right has existed continuosly form the date of the application to the date of trial. DH Homes, LLC is therefore aggrieved. Goldfeld v. Planning Zoning Commission,3 Conn. App. 72 (1986). Fairfield 2000 Homes Corporation on the other hand is "a person whose affordable housing application is [has been] denied" Under § 8-30g(b) this plaintiff is statutorily aggrieved and possesses the requisite standing.D'Amato v. Orange Planning Zoning Commission, CV92 051 63 55S, Judicial District of Fairfield at Bridgeport, December 13, 1991 (Mottolese, J.).
 DEFENDANTS REASONS
Notwithstanding that this is an affordable housing appeal under § 8-30g the court is bound, in the course of its review, to apply traditional principles of zoning jurisprudence where appropriate. West Hartford Interfaith Coalition, Inc. v.Town Council, 228 Conn. 498 (1994). In Kaufman v. Danbury,232 Conn. 122, 150 (1995) the court continued to recognize the applicability of the distinction between legislative and administrative acts. "The discretion of a legislative body, because of its role as a formulator of public policy is much broader than that of an administrative board, which serves a quasi judicial function". Id. at 150.
Moreover, "when a zoning commission has stated its reasons . . . the reviewing court ought only to determine whether the assigned grounds are pertinent to the considerations which the authority was required to apply, and whether they are reasonably supported by the record". First Hartford RealtyCorporation v. Planning and Zoning Commission, 165 Conn. 533, 543
(1973). The action of the commission should be sustained if even one of the stated reasons is sufficient to support it. Zygmont v.Planning and Zoning Commission, 152 Conn. 550 553 (1965). The key to the application of this test is whether any one reason is pertinent to the considerations which the zoning authority was CT Page 3701 required to apply. Unlike in conventional zoning appeals, the considerations which the zoning authority is required to apply are not limited to § 8-2. With the enactment of § 8-30g
the legislature has created a new set of considerations which the zoning authority must apply in affordable housing cases.
The first of these considerations is found in § 8-30g(c) (1)(A) which, in shifting the burden of proof to the zoning authority, requires that the decision and reasons cited for the decision be "supported by sufficient evidence in the record." InKaufman v. Danbury, supra, our Supreme Court considered for the first time the meaning of the "sufficient evidence" requirement. In construing the term, the court rejected equating that standard with the "substantial evidence" standard that ordinarily applies to zoning decisions made in an administrative capacity. Instead, the court approved a more relaxed standard that historically has applied to legislative as opposed to administrative zoning decisions. Thus, under § 8-30g(c)(1)(A) this Commission's only burden was to show that "the record before the [Commission] supports [ed] the decision reached". West Hartford InterfaithCoalition, Inc. v. Town Council, supra at 513; and that the Commission did not act arbitrarily . . . illegally . . . or in abuse of its discretion". (Internal quotations marks omitted).Protect Hamden/North Haven from Excessive Traffic and Pollution,Inc. v. Planning and Zoning Commission, 220 Conn. 537, 543-544
(1991).
In Town Close Associates v. Planning Zoning Commission,42 Conn. App. 94, 98, n. 6 (1996) the Appellate Court extended the "sufficient evidence" rule to apply to administrative as well as legislative determinations. While the defendant acted in its administrative capacity in denying the application for special exception, as will be seen infra, there is no need to review that administrative act in view of the courts adjudication with respect to the defendants exercise of its legislative function.
In denying the requested amendment to § 4.22.322 the defendant identified two public interests which it deemed to be substantial. First, the defendant was unwilling to act contrary to the sewer avoidance policy adopted by the Water Pollution Control Authority ("WPCA") and to reverse its own policy with respect to rural and environmentally sensitive sections of town. Second, it was unwilling to permit other than strictly land based sewerage systems because mechanical systems pose significant environmental risk. CT Page 3702
Sewer Avoidance Policy and Environmental Risk
Under § 7-246 a municipal WPCA is empowered as part of its overall responsibility, to plan for treatment and disposal of sewage within the municipality, to designate and delineate the boundaries of "areas where sewers are to be avoided".
In Newtown, the term "sewer avoidance" is used to include those areas in which community sewerage systems[2] should not be permitted. The plaintiff's argument that Newtown's expanded definition of sewer avoidance may not correspond precisely with the statutory definition is of no consequence.
In order for the developer to install its proposed community sewerage system it must obtain prior approval of the design and plan of operation of the system from the State Department of Environmental Protection. A precondition to approval is that the WPCA and the developer enter into an agreement under which the WPCA would obligate itself to manage and operate the system in the event that system were not operated effectively by the property owners in accordance with the requirements of §7-246f. In this case the Newtown WPCA as then constituted, through its chairperson, indicated that is was unwilling to commit itself to such an agreement.
While preserving the integrity of the Newtown sewer avoidance policy is a salutary purpose and is pertinent to the factors which the Commission is bound to consider under § 8-2 of the General Statutes, it does not, without more in this record, rise to the level a "substantial public interest" within the meaning of § 8-30g(c)(1)(B) for several reasons. First, the composition of the WPCA may be different at the time that the developer applies for the DEP installation permit. Second, the WPCA has no permit power of its own. See § 7-245 at et seq. Third, the action of the defendant commission is not necessarily dependent upon the action of the Water Pollution Control Authority. National Associated Properties v. Planning andCommission, 37 Conn. App. 788, 800 (1995).
On the other hand, reason #2 states as a major purpose of the sewer avoidance policy the "prevention of a failure in mechanical septic systems exposing ground water to large quantities of effluent". Related to reason #2 is reason # 4 which states as follows: CT Page 3703
 The town public sewer system will not be extended to other areas of the town, therefore the town will, if it were to allow mechanical systems to be installed, be exposed, when these systems fail, to significant environmental risk. The indefinite functioning of such systems cannot be assumed. (See generally the comments the WPCA and the remarks and reports of Peter H. Grose, P.E. of Fuss and O'Neill, Inc.).
These two reasons reflect the defendants disquietude over the reliability over time of a mechanical sewerage system and the risk of exposing an "environmentally sensitive" site to sewage effluent in the event of a systemic breakdown. The courts inquiry begins with an examination of the record to find sufficient evidence to support these reasons.
The Commission's decision on the special permit (R.#71), reason # 2(b) constitutes a finding that the subject property "lies in the towns Pootatuck River protective zone overlay district and is part of the stratified drift aquifer of the Pootatuck River Valley." Section 4.02.300 of the zoning regulations governing uses in aquifer protection districts provides as follows:
 § 4.02.300 Any discharge into the atmosphere, the ground or any water course or other body of water of any substance which, in the form and quantity discharged, will damage the fauna and flora of the lot in question, or which will be harmful to persons breathing the atmosphere or drinking or bathing in the water on or off the lot. (Emphasis supplied)
The plaintiff argues that the subject property is not in the zone of influence of an aquifer, relying on the testimony of his expert, Michael Petti, an engineer. The Commission had every right to reject that claim. First, because § 3.04.500 of the regulations confers on the Commission the authority to determine the exact boundaries of all zones and the Commission has affirmatively determined that the land is so situated. In fact, the town aquifer map (R. #91) clearly shows the property as within the aquifer protection district.[3] Secondly, the commission was free to reject Mr. Petti's testimony especially in the area of water purity concerning which it has a duty to protect its citizens independently of any expert testimony.Kaufman v. Danbury, supra at 156.[4] The court finds that there is sufficient evidence in the record to support the Commission's CT Page 3704 determination that the property was within the Pootatuck aquifer. In fact, the record reveals that it is within the primary recharge area of the aquifer. Section 2.16.5 of the regulations provides as follows:
 § 2.16.5 "Primary recharge area" shall mean that land area immediately overlying the aquifer. The boundary of the primary recharge area is the contact between the stratified drift and adjacent till or bedrock.
The sewerage system designed by the developer specifies the construction of a treatment plant which will collect sewage from all 96 units through a network of underground pipes, will remove most solids, pathogens and nitrogen from the wastewater and thereafter will pump or gravity feed the treated effluent to two underground wastewater disposal fields located at opposite ends of the most northerly portion of the property. The effluent is then supposed to leach into the earth.
The Commission had before it the expert testimony of Peter H. Grose a civil engineer who made the following statements in a report to the Newtown the First Selectman dated December 10, 1996.
"1. Soils in and around the leaching fields cannot provide renovation for the high flow rate that would result from such an intense degree of development and meet state water quality requirements. (Emphasis original).
2. The proposed Newtown Village site lies within the towns aquifer protection overlay district and is part of the stratified drift aquifer of the Pootatuck River Valley. Therefore, protection of ground water quality is of particular importance.
3. A report entitled "Computer Modeling of Ground Water Availability in the Pootatuck River Valley, Newtown, CT." prepared by the U.S. Geological Survey in 1978 shows the site to have 20-40 foot deep saturated deposits, with ground water flow generally to the southwest toward the Pootatuck River. While the site itself has lower hydraulic conductivity than some other parts of the aquifer, it was estimated that 65% of the ground Water available for drinking water would come from induced infiltration from the Pootatuck River. Therefore, there appears to be a possible indirect connection from this site to potential water supply wells. CT Page 3705
4. Ground water in the site area is classified G.A. by the Connecticut DEP, meaning their goal is that this ground water should be of drinking quality. This is a key criterion in planning and designing community subsurface disposal systems."
In his live testimony before the Commission on August 28, 1997 Mr. Grose stated "Specifically, sewer avoidance can be useful in avoiding concentrated discharge of waste water affluent to protect areas of environmental concern such as the Pootatuck aquifer which this site lies on top of."
The plaintiff has taken pains in its brief to point to the superior nitrogen removal capability which its proposed package treatment plant offers over a conventional septic system. It is apparent from Mr. Grose's testimony that he was not nearly as concerned about the risk of harm to the aquifer posed by nitrogen overload as he was the risk of pollution of the aquifer in the event of a "concentrated discharge" into the leaching fields of untreated sewage caused by a mechanical breakdown in the package sewerage treatment system.
The plaintiff counters this concern by referring to the DEP regulations which mandate stringent protective measures designed to avoid such concentrated discharges. They argue that the DEP possesses exclusive authority to regulate the engineering, permitting and environmental compliance of the system and that the WPCA authority is limited to assuring that the sewerage systems operator has the financial ability to operate the system. The court disagrees that the WPCA is so limited. By the terms of § 7-246f the WPCA is charged with insuring the "effective management" of the system to the extent that if the ownership community fails in this regard the WPCA then becomes obligated under § 7-246f(c) to satisfy the DEP in writing that it will insure effective management of the system by taking over operation. Section 7-246f(b).
Bearing in mind such a statutory scheme together with the categorical refusal of the WPCA to commit itself to the contingency of "assuring effective management" the defendant had before it the following evidence. (a) a memorandum dated December 17, 1996 from Donna M. McCarthy, the Newtown Director of Environmental Health in which she expressed the districts general concern regarding "the large quantity of waste water being discharged in one location over what appears to be sandy gravelly CT Page 3706 soil." (b) a letter from the DEP that indicated that the preliminary proposal for the sewage treatment facility was generally acceptable. (c) a memorandum from the Newtown Conservation Official to the Land Use Administrator (see n. 3 supra) which contains the following statement. "The state also taps into the aquifer to supply the Garner Correctional Facility as well as to meet the remaining demands at Fairfield Hills. . . . aquifer protection guidelines generally discourage the development of facilities or operations which generate significant amounts of waste water which are discharged into the ground. . . . Although an appropriately designed, properly installed, and well operated treatment system would not be expected to result in ground water pollution, the absence of any of the above could be reason for concern. . . . Said systems have certain limitations related to hydraulic loading, seasonally high ground water and maintenance". (d) A letter dated March 25, 1994 from M. G. Harden of the DEP to Robert Cascella, First Selectman of Newtown which states "while they (waste water treatment plants) can be made to function well, it requires great care in design, construction, financing, operation and maintenance and that "densities of development outside the municipal sewer service area should be based upon waste water disposal capabilities of the land". (e) Memorandum from the chairman of the WPCA to the chairman of the Commission dated August 7, 1997 in which he states that "according to the DEP, even with a high degree of treatment throughout Connecticut, privately owned treatment systems have had a history of operation and maintenance problems". (f) the town plan of development which recognizes the importance of protecting the aquifer as a "high priority" and announces as a goal, "the need to investigate the potential for community or package sewerage treatment facilities to decrease reliance on individual septic tanks." (Emphasis added) (g) The testimony of Peter Alagna, Chairman of the WPCA in which he states that "the town sewer plant already discharges one million gallons per day into the Pootatuck River and additional source discharges whether above or below the surface will result in degradation of the river".
Conversely, there was an absence of evidence before the Commission to assuage the fear ultimately expressed by the Commission in its reasons for denial, namely pollution of the aquifer by large concentrations of wastewater effluent which has not been properly treated due to some breakdown in the mechanical treatment process. A complete reading of the record suggests the following gaps in the evidence, among others. CT Page 3707
 1) How the effluent is to be monitored to assure that what reaches the leaching fields is appropriate.
 2) In what manner and over what period of time might inappropriate effluent, originating either because of ineffective mechanical treatment or because the leaching fields have broken down, eventually reach the aquifer and ultimately the water supply.
 3) Past experience of others with failure of this type of system, statistics on frequency of breakdown, elapsed time needed for repair, alternatives available in the event of breakdown.
The plaintiff's expert, Michael Petti, testified at length before the commission describing the chemical activity that occurs when the effluent arrives at the leaching field. He stated that after leaving the leaching field a plume of liquid will develop which depends for its rate of infiltration upon the amount of rainfall that enters the earth. He failed to address, at all, the consequences of a mechanical-breakdown in the sewerage treatment system. However, it is obvious from his highly technical testimony that successful sewage treatment by a mechanical system is a delicate operation that is vulnerable to influences which, from time to time, can produce unacceptable results.
A zoning commission, acting in its legislative capacity, is not limited to consideration of environmentally harmful conditions obtaining on a site which are definite or more likely than not to occur. A zoning commission is entitled to deny an application for a change in the zoning regulations where there is a possibility that approval of the application could result in environmental harm or physical injury to residences of the development as long as there is a reasonable basis in the record for concluding that its "denial was necessary to protect the public interest. "The record, therefore, must contain evidence concerning the potential harm that would result if the zone were changed . . . and concerning the probability that such harm in fact would occur". Kaufman v. Zoning Commission, supra at 156.
The court concludes that the Kaufman test for assessing sufficiency of the evidence under § 8-30g(c)(1)(A) has been satisfied as to all reasons set forth in the document entitled CT Page 3708 "Opinion of Newtown Planning and Zoning Commission." (2nd part of ROR Ex. 71) both because of the presence of expert opinion on the one hand and the absence of material evidence on the other hand.
 SUBSTANTIAL PUBLIC INTEREST
The next step in the analysis required by § 8-30g is for the court to determine whether the Commission has sustained its burden of proof that "the decision is necessary to protect a substantial public interest in health, safety or other matters which the Commission may legally consider." Where a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement . . . [and] attempt to search out and speculate upon other reasons which may have influenced some or all of the members of the Commission to reach the Commission's final collective decision." DiMaria v. Planning and Zoning Commission,159 Conn. 534, 541 (1970).
The Commission identified the purity of the towns water supply as a substantial public interest which must be protected. In Pratt's Corner Partnership, supra at 293, this "court said "in order to comply with the statute and sustain its burden of proof when it denies an application for an affordable housing development, the zoning authority must specifically articulate through the reasons its gives how and why each of the precepts embodied in subsection (2, (3) and (4) [now (1)(B)(C)(D)] supports its denial. In other words, the assigned reasons must address categorically (1) the necessity to protect a particular, identified public interest or interests; (2) must reflect that the Commission engaged in the balancing test dictated by subsection 2 [now C]; and 3 [now D] must manifest an honest effort to devise reasonable changes to the development that would protect the public interest that is jeopardized by the proposal. The term "substantial public interest" is not defined in the statute. As this court said in Nichols v. Killingly Planning andZoning Commission. CV94 054 047 7S, Judicial District of Hartford/New Britain at Hartford, June 9, 1995 (Mottolese, J.) "substantial" should be equated with compelling" as that term was used in United States v. City of Black Jack, Missouri508 F.2d 1179, [508 F.2d 1179], (8 Cir. 1975).
On the record in this case it is hard to imagine a more substantial public interest than protection of a sole source water supply from sewage contamination. Bearing in mind our CT Page 3709 Supreme Court's analysis in Kaufman v. Danbury, supra at 154-162 of the requisite level of probability of harm to the public interest, this court notes that the exigencies in Kaufman were far less compelling than they were here. For example, in Kaufman,
Lake Kenosha served as an auxiliary water supply whereas the Pootatuck aquifer serves as a primary, sole source of supply. Next, the harmful contamination involved in Kaufman was nutrient loading which in the worst case would have tainted the quality of the drinking water to the extent that the water still would have been within acceptable standards. Finally, in Kaufman, there was credible expert testimony that there would be no harmful discharge into the watershed. In this case there is not only no assurance against harmful discharge but there is evidence that package sewage treatment plants in general do not have a "good track record of performance, operation or maintenance".
The Supreme Court's analysis permits an inference that in weighing the probability of harm presented by a particular hazard, a zoning authority is warranted in applying a rule of proportionality. That is, it may require a lower degree of probability of harm the higher the substantiality of the public interest sought to be protected and a higher degree of probability the lower the substantiality of the public interest. This court concludes that the Commission easily reached the appropriate level of proportionality. Expert testimony is not necessary to persuade a board of lay persons that untreated sewage which infiltrates a water supply will contaminate the water. See, Bader v. United Orthodox Synagogue, 148 Conn. 449,459 (1961). For if there existed a genuine possibility that such a catastrophe as contamination of the water supply could occur the Commission did not need any evidence of the degree of probability. It was patently obvious. The Commission has satisfied its burden that denial of the requested change in the regulations was necessary to support this substantial public interest.
OUTWEIGHING THE NEED
The final step on the record of this case is to determine whether the identified public interest clearly outweighs the need for affordable housing § 8-30g(c)(1)(C).
As this court held in Pratt's Corner Partnership v.Southington, supra at 93, the decision of the Commission must reflect the fact that it engaged in the balancing test mandated CT Page 3710 by the above subsection. The Commission's stated reasons reveal that it fairly carried out its statutory responsibility in this regard. Although it appears that the "need" considered was the local, municipal need rather than a need of broader geographic breadth, See, West Hartford Interfaith Coalition. Inc. v. TownCouncil, supra at 521, n. 23, it is apparent from the foregoing discussion of proportionality that the Commission did not believe that the balancing test was a close call. Rather, it emphatically resolved that the necessity to protect the water supply for its residents clearly outweighed the need for affordable housing.
Because the plaintiff has not challenged the Commission's action under § 8-30g(c)(1)(D) this subsection is not at issue.
 CONCLUSION
In summary, the court finds that there is sufficient evidence in the record to support the Commission's decision and the reasons cited for such decision, that the Commission's decision is necessary to protect a substantial public interest in Newtown's water supply and that such public interest clearly outweighs the need for affordable housing. As noted earlier, the action of the Commission should be sustained if even one reason is sufficient to support it. Zygmont v. Planning and ZoningCommission, supra. Accordingly, there is no need for the court to reach the remaining reasons or other grounds for appeal. The appeal is hereby dismissed.
Mottolese, Judge